THE ATTORNEY-GENERAL v. THE TOWN OF BELLEVILLE.

Argued February 23, 1911—Decided June 6, 1911.

1. Under the act for the government of towns (*Gen. Stat.*, p. 3525, § 4), the township becomes incorporated as a town after an election in favor thereof, upon filing with the secretary of state the certificate required by the act; thereafter the existence of the town as a municipal corporation cannot be questioned by *certiorari* but only by *quo warranto* prosecuted by the attorney-general in his official capacity.

2. Since the act of 1905 (*Pamph. L.*, p. 14), by which local elections in municipalities other than cities were directed to be held on the day of the general election, the board of county canvassers is the only board authorized to canvass the votes.

3. At an election to decide upon incorporation as a town under section 4 of the act of 1895 (*Gen. Stat.*, p. 3525), the ballot should be printed as directed in that section, notwithstanding the amendment of section 52 of the act to regulate elections by the act of 1900 (*Pamph. L.*, p. 303).

4. The provisions of the act to regulate elections as to the form and contents of the ballot are directory and not mandatory, and mere irregularities will not vitiate the election if it is fair in other respects.

On *quo warranto*.

Before Justices SWAYZE, BERGEN and MINTURN.

For the attorney-general, *John R. Hardin* and *Thomas J. Lintott*.

For the defendant, *Edward Q. Keasbey.*

The opinion of the court was delivered by

SWAYZE, J.  Two writs of *certiorari* were allowed at the suit of John N. Klein, one against the clerk of the township of Belleville, Essex county, and one against the secretary of state.  The object of these writs was to test the legality of an election held in the township of Belleville on November 8th, 1910, to decide the question of incorporating that municipality as a town under the act of March 7th, 1895.  Both writs were allowed November 19th.  The returns of the election had been filed with the secretary of state November 16th. Upon the argument it was suggested that under these circumstances *certiorari* might be an inappropriate remedy, and thereupon the prosecutors procured this information, to be filed by the attorney-general in his official capacity in order that the meritorious questions might be disposed of.  To this course the defendants assented and have by stipulation facilitated the proceedings.  Section 4 of the act providing for the formation, establishment and government of towns (*Gen. Stat., p.* 3525) enacts that if a majority of the votes cast at the election shall be in favor of incorporating a town under the act, a certificate of the result of the election shall, within three days after the result shall have been declared, be filed with the secretary of state, and that from and after filing the same the township shall be a body politic and corporate, in fact and in law.  The effect of this provision was to make the corporation a public corporation from the time of filing the certificate, and its existence could not be attacked by *certiorari* (*Campbell* v. *Wainwright*, 21 *Vroom* 555), but only by a *quo warranto*, prosecuted by the attorney-general in his

official capacity and not by a private relator. *Gibbs* v. *Somers Point,* 20 *Id.* 515. If, therefore, the certificate filed with the secretary of state was such a certificate as the act requires, the writs of *certiorari* must be dismissed and the existence of the corporation must be determined in the present proceeding by *quo warranto.* What the statute requires is a certificate of the result of the election signed by the chairman of the township committee and attested by the clerk, together with certified copies of the petition, ordinance and statement of the board of canvassers or election officers who canvassed the vote, and proof by affidavits that due notice of such election was given. In the present case, a certificate of the result of the election by the chairman of the township committee, and attested by the township clerk, was duly filed within three days after the result of the election had been declared on November 14th, by the board of county canvassers, and this certificate was accompanied by a certified copy of the petition, of the ordinance, and of the statement of the board of canvassers, with proof by affidavit that due notice of the election had been given. The only question raised in behalf of the attorney-general relates to the statement of the board of canvassers. That objection is, that the board of county canvassers could not determine the result of the local election. Section 102 of the act regulating elections (*Pamph. L.* 1898, *p.* 289) enacts that the county board of elections shall act as a board of county canvassers for all general and special elections, and for all local or municipal elections in the several cities of the state. Prior to 1905, there was a local board of canvassers in municipalities other than cities, for township, local or charter elections, but by the act of 1905 (*Pamph. L., p.* 14) the local elections in these municipalities were directed to be held on the day of the general election, and it was enacted that the ballots should be canvassed and the result of the election determined as provided by law in the case of county officers. Thereafter the board of county canvassers was the only board authorized to canvass the votes. The objection to the form of the certificate of the county board is without merit. It sufficiently appears that the election was held in

Belleville township for the submission of an act for the incorporation of the town, and that at that election a majority was cast in favor of the act. The result is that the writs of *certiorari* should both be dismissed.

The question, therefore, is, whether the act for the formation of towns was complied with, so that the town of Belleville is a *de jure* and not a mere *de facto* corporation. The objection raised to the proceedings relates only to the form of the ballot. That ballot was prepared in accordance with the requirements of section 4 of the act for the formation of towns, which required that in case the question of the incorporation of towns should be submitted at a town or charter election, the words "for incorporation as a town under the act entitled 'An act providing for the formation and government of towns,'" should be printed on each ballot, with the list of candidates thereon, and that if said words or proposition be marked off or defaced upon the ballot, it should be counted as a vote against the same; if not marked off or defaced the ballot should be counted as a vote in favor thereof. The point of the objection is that by the act of 1900, section 52 of the Elections act was amended so as to require that whenever a question or proposition was submitted to the people it should be printed upon the ballot beneath the list of candidates thereon with the words "for" and "against" printed above and immediately preceding such proposition; that if the word "for" be marked off, the ballot should be counted as a vote against the proposition; if the word "against" be marked off, the ballot should be counted as a vote in favor, and if neither "for" nor "against" be marked off, the ballot should not be counted. It is urged with great force that by this section of the Election law the voter is given an opportunity to vote either for or against or not to vote at all, while the provision of section 4 of the Towns act requires the voter to vote either for or against. It must be conceded that the contention of the attorney-general could not have been made prior to the amendment of the Election act by the act of 1900 (*Pamph. L., p.* 303), for as the Election act stood before that amendment it had been held by the Court of Errors and Appeals to

be inapplicable to a statute providing for a different method of voting on a referendum. *Freeholders of Essex* v. *Park Commission, 33 Vroom* 376. It is now argued that the decision in that case rested upon the fact that the fifty-second section of the Elections act of 1898 applied only to official ballots which at that time were provided, in the case of local election, in cities only. Mr. Justice Garrison did indeed refer to that circumstance as a conclusive argument against holding that the fifty-second section of the Elections act was applicable to elections held under the County Park act, but his decision rested on the broader ground that the General Election act had for its object the regulation of the political function from which it took its title, and not the regulation of the more or less unusual scheme of submitting propositions to popular vote. The natural meaning to be attached to an act entitled "An act to regulate elections," in view of the history of the legislation is, that it relates to the method of electing officers, and not to a method of deciding whether or not a particular policy shall be adopted. The very word election has come to connote a choice of officers, while the word referendum or submission to the people is more applicable to the more modern practice of submitting to popular vote questions other than the choice of officials. Section 52 of the Elections act comes originally from what is known as the Ballot Reform act of 1890. *Gen. Stat., p.* 1339, *pl.* 275. The diligence of counsel for the defendant has collected numerous statutes both before and since the Ballot Reform act, and before and since the Elections act of 1898, providing for a different form of submission. They are sufficient to demonstrate that neither under the Ballot Reform act of 1890 nor under the Elections act of 1898 did the legislature at any time assume that the provisions of those acts on the subject were intended to reach all cases. They were probably meant to reach only cases in which no other provision was made. The provision of the Town act of 1895 is itself sufficient to prove this. Since that act was enacted, after the Ballot Reform act of 1890, its provisions would supersede the Ballot Reform act, and since the provision of the fifty-second section of the Elections act of

1898 applied only to official ballots, which were not provided for at all in municipalities affected by the Town act of 1895, it is quite clear that the provisions of the Town act could not have been superseded by the Elections act of 1898. This being so, it would be difficult to hold that the act of 1900 which is entitled "An act to amend an act entitled 'An act to regulate elections,'" contained a provision which would have had the effect of repealing a provision of an act relating to towns, which was not subject to the act to regulate elections. The title would in that case have been deceptive.

The act of 1900 contains no words of repeal, and if it operates to repeal the provision of section 4 of the Town act it must be by implication. The difficulty with holding that there is a repeal by implication is enhanced in this case by the fact that section 4 of the Town act was not law at the time the act of 1900 was passed, for by the act of 1896 (*Pamph. L., p.* 229) it was provided that no town or city should be incorporated except by special act of the legislature, and inconsistent legislation was repealed. There was at the time nothing therefore in this respect that the act of 1900 could repeal. Ten years after the passage of the act of 1900, the act of 1896 just referred to was repealed (*Pamph. L.* 1910, *p.* 42), and the effect of this repeal, on well-settled principles, was to restore the old law. *Wallace* v. *Bradshaw,* 25 *Vroom* 175. The act of 1910 is the latest expression of the legislature's will. By restoring the legislation on this subject existing prior to the act of 1896, it restored it as a whole, including the provisions as to the submission of the question and the form of ballot. We are, therefore, of opinion that the ballot in this case was in compliance with the statute.

Under our present system all ballots are official ballots prepared by a public officer, and minute directions are given by the statute as to the form and contents of the ballot. If a failure to comply with any one of these requirements is sufficient to vitiate the ballot, a power is put in the hands of the officials preparing ballots that would make it possible for them to thwart the will of the voter, who is compelled to vote the ballot thus prepared or not to vote at all. If we assume that

all of our county clerks are honest, intelligent and painstaking, still the chance of error in the more populous counties, where many hundred different kinds of ballots must be prepared, and of failure to comply with the minute provisions of the law, is extremely great. The object of the act is not to thwart the will of the voter or to throw obstacles in the way of the expression of that will, or to increase the power of the officers charged with the preparation of the ballot. It is for this reason that provisions of this character are generally held to be directory and not mandatory, and that mere irregularities are not allowed to vitiate the election. *State* v. *Elwood,* 12 *Wis.* 551; *Cattell* v. *Lowry,* 45 *Iowa* 478; *Thomas* v. *Adsit,* 116 *Mich.* 106; *State* v. *Bernholtz,* 106 *Iowa* 157; *Schuler* v. *Hogan,* 46 *Id.* 195. We have cases somewhat similar in our own state. In *Mitchell* v. *Tolan,* 4 *Vroom* 195, the election was held on the wrong day, and not on the day required by statute, but as it appeared to be fair the court refused to allow an information in the nature of a *quo warranto* to issue. This was equivalent to holding the election good. In *Winters* v. *Warmolts,* 41 *Id.* 615, the city clerk had failed to give notice of the election for alderman there in question, but it appeared that there was a full and fair election and the court said that its result could not be ignored by reason of the failure to give the statutory notice. In *Brown* v. *Street Lighting District, Id.* 762, the clerk had failed to give the ten days' notice of the election required by the statute, but the court sustained the election. In *Lane* v. *Otis,* 39 *Id.* 656, the polling place was outside of the election district; the act required the polling place to be within the election district. Mr. Justice Fort, delivering the opinion of the Court of Errors and Appeals, said: "The right of suffrage is too sacred to be defeated by an act for which the voter is in no way responsible, unless by the direct mandate of a valid statute no other construction can be given. There is nothing in our Election law which requires the rejection of votes honestly cast and counted in a case like the one before us." These cases are to be distinguished from a case like *Marcellus* v. *Garfield,* 42 *Id.* 373, where the form of the ballot

was ambiguous, and permitted an inference that the vote had been in favor of a proposition different from that which had been submitted. In the present case, out of seventeen hundred and twenty-five votes polled ten hundred and fourteen were in favor. There is nothing to indicate that there was any unfairness about the election, or that the expression of the popular will was not accurately reflected in these figures, and even if we were of opinion that the form of the ballot should have been different, we should still think that the defect was not sufficient to vitiate the result.

Judgment must therefore be entered in favor of the defendant, but as this is an action by the attorney-general in his official capacity, no costs are allowed.